UNITED STATES BANKRUPTCY COURT                    Not For Publication
SOUTHERN DISTRICT OF NEW YORK
_____
                                               :
In re                                          :    Case No. 02-11553 (AJG)
                                               :
GLADYS BLANCO BACOTE,                           :    Chapter 7
                                               :
                    Debtor.                     :
_____:
                                               :
GLADYS BLANCO BACOTE,                           :
                                               :
                    Plaintiff,                  :
                                               :
            v.                                  :    Adversary No. 05-03209
                                               :
EDUCATIONAL CREDIT MANAGEMENT                   :
CORPORATION,                                    :
                                               :
                    Defendant.                  :
_____:


**OPINION, AFTER TRIAL, REGARDING PLAINTIFF-DEBTOR'S
REQUEST FOR A DISCHARGE OF HER STUDENT LOANS
DUE TO UNDUE HARDSHIP**

A P P E A R A N C E S

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Attorneys for the Defendant
25 Main Street, P.O. Box 800
Hackensack, NJ 07602

            Kenneth L. Baum, Esq.
            Scott M. Brown, Esq.
                Of Counsel

GLADYS BLANCO BACOTE
Pro se


ARTHUR J. GONZALEZ
United States Bankruptcy Judge

## BACKGROUND

Gladys Blanco Bacote ("Plaintiff" or "Debtor") filed a petition for relief under chapter 7 of the United States Bankruptcy Code on April 3, 2002.  On October 4, 2002, a discharge was issued generally discharging Plaintiff's debts.  However, pursuant to section 523(a)(8) of chapter 11 of the United States Code, her student loans were not discharged.  The Order of Discharge and was granted on October 6, 2002.  On October 16, 2002, Plaintiff's case was closed.  On October 13, 2005, seeking to have her student loans discharged as well, Plaintiff filed a motion to reopen the case and waive filing fees.  On November 2, 2005, the Court granted the motion.  On November 29, 2005, Plaintiff filed an adversary proceeding seeking to have the student loans discharged due to "extreme" hardship.

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§1334(a) and 157(a).  This adversary proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(I) in that it is a proceeding to determine the dischargeability of a particular debt.

## FACTS

### EDUCATION

Plaintiff attended Long Island University from 1976 until 1982.  Upon completing her studies in 1982, Plaintiff received a Bachelor of Science degree in Accounting.

**LOANS**

According to the records submitted by both parties, Plaintiff signed five promissory notes

for student loans (collectively, the "Loans") dated as following

| | | |
|---|---|---|
| November 26, 1979 | $2,500 | ("Loan 5")[1] |
| September 25, 1980 | $2,500 | ("Loan 4") |
| January 7, 1982 | $3,000 | ("Loan 3") |
| October 1, 1982 | $5,000 | ("Loan 2") |
| June 7, 1984 | $5,000 | ("Loan 1"). |

The total amount of the Loans is $18,000.[2]

Per the National Student Loan Data System records, as provided by the Educational

Credit Management Corporation ("ECMC" or the "Defendant"),[3] the lenders and guarantors of

the Loans changed with time. The original lender of the Loans was Dime Savings Bank of New

York (hereinafter referred to as "Dime"). The subsequent lender of the Loans was SLM/Loan

Servicing Center/Virginia (also referred to as SLM Education Loan Corporation by the

Defendant, hereinafter referred to as "SLM"). However, the dates during which Dime and SLM

were the lenders of the Loans vary. For Loan 1, Dime was the lender from May 22, 1984 until

July 31, 1998 and SLM was the lender from August 1, 1988 until at least June 1, 2006. For Loan

2, Dime was the lender from August 21, 1982 until January 2, 1984 and SLM was the lender

from January 3, 1984 until at least June 1, 2006. For Loan 3, Dime was the lender from

December 2, 1981 until January 2, 1984 and SLM was the lender from January 3, 1984 until at

least June 1, 2006. For Loan 4, Dime was the lender from August 25, 1980 until January 2, 1984

---

[1] The Loans are defined as Loan 1, Loan 2, Loan 3, Loan 4 and Loan 5 in the National Student Loan Data System (the "NSLDS") printout attached to Defendant's Affidavit of Amy C. Mercer, signed and notarized on June 5, 2006. *See* page 11.
[2] Although neither party disputes the amounts of the original Loans nor the number of the Loans in the initial filings or letter communications with the Court, the Defendant later cites different amounts for the original amount borrowed or principal due on the Loans in different communications with the Plaintiff and in Court filings discussed *infra* on pages 9-11. The Court notes these numerous unexplained discrepancies and discusses them in detail *infra*. Further, the Court notes that a possible explanation for the discrepancy is that the original amount and the interest could have been consolidated in the "new payment plan" Plaintiff made in 1985, discussed *infra* on page 5.
[3] *See* note 1.

3

and SLM was the lender from January 3, 1984 until at least June 1, 2006.  For Loan 5, Dime was

the lender from November 26, 1979 until January 2, 1984 and SLM was the lender from January

3, 1984 until at least June 1, 2006.

The original guarantor of the Loans was New York State Higher Education Services

Corporation ("NYSHESC" or "HESC").  The subsequent guarantor of the Loans was

Transitional Guaranty Agency ("TGA").  However, again, the dates during which time HESC

and TGA were the guarantors of the Loans vary.  For Loan 1, HESC was the guarantor from

May 22, 1984 until December 13, 2005 and TGA was the guarantor from December 14, 2005

until at least June 1, 2006.  For Loan 2, HESC was the guarantor from August 21, 1982 until

December 13, 2005 and TGA was the guarantor from December 14, 2005 until at least June 1,

2006.  For Loan 3, HESC was the guarantor from December 2, 1981 until December 13, 2005

and TGA was the guarantor from December 14, 2005 until at least June 1, 2006.  For Loan 4,

HESC was the guarantor from August 25, 1980 until December 13, 2005 and TGA was the

guarantor from December 14, 2005 until at least June 1, 2006.  For Loan 5, HESC was the

guarantor from November 26, 1979 until December 13, 2005 and TGA was the guarantor from

December 14, 2005 until at least June 1, 2006.

**<u>REPAYMENTS</u>**

Plaintiff claims she made her first attempt to repay the Loans by making $50.00

payments to Dime in 1979 and 1980 when the Plaintiff claims the first loan ("Loan 5") became

due.[4]  She claims that she made monthly $50.00 payments for "a year plus or two years" but has

no records due to water damage to her records when her residence became flooded.[5]

She admits having defaulted on this first attempt to repay the Loans.  However, she

asserts that once she was able to resume payments in 1985, she negotiated a new payment plan[6]

with Long Island Trust Company at $207.75 per month.  Plaintiff claims that, in her second

attempt at repayment, she made a total of eighteen monthly payments to the Installment Loan

Department of Long Island Trust Company between July 1985 and November 1986.  Plaintiff

provided copies of stubs for months 2 through 18 and bills for months 1 and 4.  Also, of the

seventeen stubs provided, five are stamped "PAID" by Long Island Trust Company.  The

remaining twelve stubs are either blank or contain notations in the Plaintiff's handwriting of the

date paid, the amount paid ($207.75), and either the number of the check used to pay that month

and/or "cash."  Plaintiff repeatedly claimed in submissions to the court that she made "8 or 9"

monthly payments in the amount of $207.75, starting in July of 1985.

Per a copy of the relevant payment screen provided by ECMC, eight payments were

made and posted to Plaintiff's account between November 7, 1985 and July 8, 1986.  However,

the amounts paid are recorded in "current value," or as $161.45 instead of $207.75.  Two

payments are noted to have a current value of $150.00 and $172.90.  Defendant's explanation of

current value as used here is simply that it means the same as "amount paid."  The individual

loan to which Plaintiff's payments were credited is also not clear.  Defendant has not provided

that information in any filing or testimony provided.

---

[4] It is unclear from the documents provided by the Plaintiff and the Defendant when the first loan (designated by NSLDS as Loan 5) actually became due.
[5] Plaintiff claims that she tried to get records from Dime, but was unsuccessful because the bank is no longer in business.  This is further discussed *infra* on pages 10-11.  She does not provide a date for when her residence was flooded.
[6] Plaintiff has not provided any documentation of that new payment plan.

Although Plaintiff admittedly has not made any voluntary payments since 1986, she claims that some governmental entity has been offsetting her debts on the Loans by taking money out of her tax refunds from 1986 until 2003. She states that she has filed tax returns for 2004 recently and thus does not have any information regarding any monies that may be or have been taken from her 2004 refund. She also states that the amounts that were taken from her refunds and credited towards the Loans are not reflected in the balances of the Loans. Defendant disputes that contention.

Defendant provides two documents detailing payments made by Plaintiff or credited to her account. The first, described by Defendant as Sallie Mae Payment History, shows that the Plaintiff made a total of twenty payments as follows, twelve payments of $161.45 (for a total of $1,937.40), one payment of $150.00, one payment of $172.90, and six payments of $170.75 (for a total of $1,024.50). The total of these twenty payments is $3,284.80. The second, described by Defendant as HESC Payment History, shows that the following payments, which evidently were applied to pay down the interest, were credited to the Defendant's debt between October 29, 1990 and December 14, 2005 as follows: seven payments as State Tax Payments (in the amounts of $257.54, $830.51, $706.44, $704.58, $825.12, $125.00, and $126.37, or a total of $3,575.56), eight payments as Tax & Finance Spousal Refund (all in the amount of $0.00), and three payments as IRS Offsets (in the amounts of $2,679.50, $8,048.25, and $25.11), for a total of $14,328.42. In addition, two payments that are not categorized are credited in the amounts of $688.60 and $62.50, for a grand total of $15,079.52. In an attached affidavit provided by Defendant's employee,[7] it is noted, "Debtor's claim reflects that she made payments totaling $18,364.02" but also that "ECMC has received no payments."

---

[7] *See* note 1.

6

On December 6, 1988, HESC, as the original guarantor of the Loans, paid the claim of the current lender, SLM.  On December 14, 2005, pursuant to an agreement between Defendant and HESC, where "HESC assigns its accounts that are in an adversary to ECMC for handling," HESC assigned its interest to Defendant.  Also, on December 14, 2005, Defendant filed a Motion to allow entry of an order substituting ECMC as the proper defendant.[8]

## **EMPLOYMENT**

Regarding Debtor's employment search efforts, prior to attending college and during her studies, for a total of approximately two years, Plaintiff was employed part-time as a junior tax clerk for EJ Korvettes.  Plaintiff's tasks included filing W2 statements and reconciling monthly and yearly taxes.

Plaintiff claims that upon graduation she could not find work in the accounting field.  At the time, she claims she only sought employment in the accounting field since that was her profession.  She states that she opened her own baking business in 1985 and that it lasted until 2002.  Further, she states her income during that time period was supplemental to her husband's income, which was the main source of income.  She explains that her baking business was earning an approximate gross income of $20,000 to $25,000, but claims to have had high overhead causing her approximate net income to be $0 or, rather, allowing her only to break even.  She states that was not seeking any other employment during the time period that she was operating her baking business.

Plaintiff claims the events of September 11, 2001 caused her business to slow down.  She contends that her "…situation kept on spiraling down and when 9/11 hit, [she] crashed financially.  [Her] husband was laid of[f,] due to down-sizing and [she] was forced to file for bankruptcy in 2002."  Plaintiff also notes that after filing for bankruptcy, both she and her

---

[8] *See infra* page 9.

husband had to file for public assistance.  She has been receiving public assistance, per her records, since August 2, 2002.

Since giving up her baking business in 2002, Plaintiff has been employed a few times. Norvergence, located at 550 Broad Street, Newark, New Jersey, per Plaintiff's records, employed her from December 10, 2003 until February 28, 2004.  Plaintiff indicates that she was employed there as an inside sales representative, where her duties included "soliciting sales from different companies all over the United States trying to sell a hardware solution that the company had to offer."  Prior to this job, Plaintiff states she had no prior experience in selling that kind of product.  Plaintiff explains that her employment with Norvergence ended on February 28, 2004 when she was laid off because the company went bankrupt and closed.

From June 2004 until January 2005, Plaintiff received state-funded training in computer accounting at Key Skills in New Jersey.  In April 2005, Plaintiff applied for a position as an import/export intern via an email that she received from an import/export company.  Plaintiff's duties were supposed to be handling packages, receiving packages and forwarding them to other parts of the country.  Plaintiff testified that she was supposed to have use of an office from which to perform her duties, but never did.  In addition, she testified that she was supposed to be paid $500-$700 per week and worked for three months, but was never paid for the work she performed.  Plaintiff received and shipped out two packages to Estonia.  Further, she claims investigators came to her residence and took all of the information related to that enterprise shortly thereafter.  According to the Plaintiff, the aforementioned is a complete history of her employment from 1979 until February 28, 2006.[9]

---

[9]Plaintiff also testified that she was employed on February 28, 2006 for three hours but did not provide any details as to that position.

## AMOUNT OWED

On November 8, 2005, Pioneer Credit Recovery, Inc. ("Pioneer") sent Plaintiff a letter in an attempt to collect on the defaulted Loans on behalf of HESC. Pioneer noted the current balance as $52,372.16, $22,762.00[10] due as the original amount borrowed and $29,610.16 due as accrued interest and penalties for 22 plus years and accruing at 9% per year. On November 29, 2005, Plaintiff commenced an adversary proceeding by filing a complaint against HESC.

On December 9, 2005, Defendant filed an answer to the complaint asking the Court to dismiss Plaintiff's complaint with prejudice, on the bases that (i) Plaintiff failed to state a claim upon which relief can be granted, (ii) Plaintiff does not meet the requirements of undue hardship, and (iii) Plaintiff's complaint is barred under the doctrine of laches. In the answer, Defendant stated, in relevant part, that "[e]xcept to admit that Debtor is indebted to ECMC in the amount of approximately $22,762.00[11] as of December 6, 2005, …, ECMC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in the Complaint." On December 12, 2005, Defendant mailed a copy of the answer to the Plaintiff.

On December 14, 2005, Defendant filed a motion for entry of an order (1) substituting ECMC as proper defendant and (2) designating form of caption. In this motion, Defendant stated, in relevant part, "[a]s of December 6, 2005, the total amount of approximately $22,762.00[12] was owed on the loans, in the aggregate, inclusive of principal, unpaid interest and costs, if any." On December 16, 2005, Plaintiff filed an objection to Defendant's answer. On January 5, 2006, the order substituting ECMC as Defendant was entered.

---

[10] *See* note 2.
[11] *See* note 2.
[12] *See* note 2.

On March 2, 2006, Defendant stated in a letter addressing consolidation, that as of December 14, 2005, the balance on the Loans was $65,717.66, specifically $22,765.32[13] as principal, $29,808.80 as unpaid interest and $13,143.54 as costs. Defendant also stated that the Loans bear a fixed interest rate of 9% with interest accruing at a per diem rate of $5.62.

Also on March 2, 2006, Defendant advised Plaintiff that she was eligible for the William D. Ford Direct Loan Consolidation Program (the "Ford Program"). In addition, Defendant noted that, under that program, Plaintiff is eligible for the Income Contingent Repayment Plan ("ICRP") because the Loans are in default. The ICRP bases the amount of the monthly payment on the borrower's adjusted gross income, total amount borrowed and family size. Based on Plaintiff's current balance, marital status, family size, and adjusted gross income of $0 as represented to ICRP, Defendant claimed Plaintiff's repayment amount would be $0 for 2005 and would continue to be $0 per month "…unless and until [her] adjusted gross income exceeded $13,200.00 (2006 poverty level for a family size of two)." Plaintiff states that she does understand that under the ICRP her monthly payment would be $0 under her current conditions. Further, Defendant claimed Plaintiff's repayment period would be 25 years or 300 months, after which "any remaining balance would be cancelled by the United States Department of Education." In addition, Defendant noted that Plaintiff is eligible to seek a deferment of payment or forbearance. Plaintiff has declined the offer to participate in ICRP.

On March 17, 2006, Plaintiff filed a request for the production of documents. Plaintiff requested her payment history from Dime.[14] Previously, Plaintiff stated that she had tried to get the records from HESC, who directed her to ECMC. In that request, Plaintiff requested past payment history made to Dime, "…now defunct and bankrupt—from 1979 on, when payment

---

[13] *See* note 2.
[14] *See supra* pgs. 3-4.

was defaulted for the 1st[sic] time."  Plaintiff also requested the history of payments to Long Island Trust Company and tax refunds that were taken from Plaintiff for payment to HESC.

On March 23, 2006, Plaintiff filed a letter with her responses to interrogatories and Defendant's requests for production of documents.  On May 4, 2006, Defendant filed proposed findings of fact and conclusions of law.  On May 9, 2006, Plaintiff filed a motion for "relief due to undue hardship" and discharge of her loans.  (The Court assumes that the relief sought was pursuant to the "undue hardship" exception in section 523(a)(8)).

A hearing was held on May 18, 2006.  At the hearing, the Court requested that the Defendant submit to the Court, with a copy to the Plaintiff, a written reconciliation of what loans were taken out, what payment history they have, identify if and how the payments were allocated among the loans, and how they arrived at the balance due.

On May 23, 2006, Plaintiff filed a letter in which she reiterated the points stated at the hearing.  On June 5, 2006, Defendant filed an affidavit of Amy C. Mercer, ECMC employee, with exhibits and an affidavit of service.  In the affidavit, in addition to reiterating the history and status of the Loans, Mercer stated that the balance of the Loans is $66,620.79,[15] including "principal, interest, and collection costs mandated by federal regulation," and that Plaintiff's payments totaled $18,364.02.  Further, Mercer noted that ECMC had received no payments. Finally, Mercer was unable to find any documents relating to Long Island Trust Company, and claimed that a history of New York banks revealed no relationship between Long Island Trust Company and Dime.

A conference call was held on June 22, 2006 to discuss the post-hearing submissions and confirm that there were no further submissions that were going to be made.  Later that day, Plaintiff filed a letter regarding the conference call and reiterating many of the points she

---

[15] *See* note 2.

previously made.  On August 11, 2006, Defendant filed a letter confirming that it had no

response to Plaintiff's most recent filing and requesting that the record for the matter be closed.

The Court then closed the record.

## **ARGUMENT**

Plaintiff argues that she faces undue hardship and, thus, the Loans should be discharged.

Further, she argues that she cannot obtain employment, explaining that she is currently

unemployed and has been for approximately the past three years.  She indicated she would be 56

years old in September and that her age is a reason that she is not able to obtain employment in

addition to her lack of experience and lack of existing employment.  Also, Plaintiff argues that

she has never found a job in her field of accounting since graduation.  Although she has

upgraded her skills with training since graduating and gained other skills through the public

assistance program, Plaintiff argues she is still not "marketable" because she has no experience.

Plaintiff asserts that she has been searching for a job in a number of ways - attending job fairs,

sending out information, going on interviews - and has applied to a large number of jobs, as

evidenced by the provided spreadsheets.  She states she cannot obtain a job as an accountant

despite her searches and applications, and has also searched for and applied for jobs as an office

assistant and administrative assistant with computer skills, as well as a baker.  She argues that

she has not limited her search and has looked for "anything that is paying money right now."

She has found jobs to which she has applied by word of mouth, the Internet, job websites,

newspapers and checking the courthouse near her residence for open positions.  Despite those

efforts, Plaintiff argues, she has never been able to procure a job because she has been rejected

due to her lack of experience, lack of current employment and her age.  Although Plaintiff

acknowledged that she does not have any physical limitations or disabilities that would prevent

her from working, she argues that she did suffer a fall on February 12 or 13, 2006 which is causing her back and knee pain. However, she does not assert that any injury from that fall limits her ability to obtain employment.

Plaintiff also argues that in addition to her inability to obtain gainful employment, she has mounting financial burdens. Although she does not have any children and lives with her husband, she states that he is injured and she must care for him. Further, she asserts that she is struggling to pay her rent and that her utilities and "basic necessities" are past due.

Defendant argues that Plaintiff's participation in ICRP would not be a burden to her, as discussed *infra* on page 13. However, Plaintiff argues that by participating in ICRP, she would be reaffirming her indebtedness to ECMC. She says she does not wish to do so for two reasons: first, because ECMC did not exist when she signed for the Loans and, second, because she cannot pay back the Loans due to her current economic status. She argues it would be irresponsible for her to take on the Loans again given her present situation and that she cannot forecast her future financial situation, having not found a job over the past three years despite her search efforts. Therefore, she does not believe she will be able to pay the loans. Thus, because she does not wish to reaffirm her indebtedness, a prerequisite step to enter the ICRP, she does not wish to enter ICRP.

Defendant argues that Plaintiff is not suffering an undue hardship and therefore the Loans should not be discharged. Defendant argues that Plaintiff can maintain a minimal standard of living if forced to repay the Loans. Defendant argues that under ICRP, Plaintiff would be able to "repay her student loans without any additional hardship to her." Defendant argues, "Where a debtor is eligible to consolidate her loans under ICRP, her ability to maintain a minimal standard of living is deemed not to be affected by the inclusion of the loans." Thus, Defendant claims

Plaintiff can maintain a minimal standard of living even if forced to repay the Loans since, under

ICRP and Plaintiff's current conditions, Plaintiff would not have to make any payment for the

2006 calendar year.

Also, Defendant argues that there are no circumstances that exist to indicate that

Plaintiff's current conditions are going to persist for a significant portion of the period in which

Plaintiff is obligated to repay the Loans.  Defendant claims the circumstances must be "unique or

extraordinary" and cites case law supporting its claims.  Defendant contends that Plaintiff has

marketable skills and that her current unemployment "does not constitute a 'certainty of

hopelessness.'"  Defendant notes that Plaintiff cannot limit herself in what jobs she obtains and

argues that Plaintiff bears the burden in proving that she cannot in the future earn more money, if

she so chooses to argue.

Finally, Defendant argues that Plaintiff has not made a good faith effort to repay the

Loans.  Defendant argues that Plaintiff's failure to avail herself of repayment options constitutes

a failure to make a good faith effort to repay.  Further, Defendant argues that Plaintiff's failure to

make any payments over the last almost twenty years, even if she made payments prior,

demonstrates a lack of a good faith effort to repay the Loans.


## **DISCUSSION**

As previously noted, on October 4, 2002, a discharge was issued generally discharging

Plaintiff's debts pursuant to section 523(a).  However, as per section 523(a)(8), Plaintiff's

student loans were not discharged.

Under section 523(a)(8),[16] student loans are exempt from discharge unless "undue hardship" is established. Section 523(a)(8) provides, "a discharge under…this title does not discharge an individual debtor from any debt –

> for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents."

In the Second Circuit, in order for Plaintiff's student loans to be discharged under section 523(a)(8), she would have to satisfy the *Brunner* test for undue hardship. *Brunner v. New York State Higher Educ. Servs. Corp.*, 46 B.R. 752, 756 (S.D.N.Y. 1985), *aff'd*, 831 F.2d 395 (2d Cir. 1987). The debtor has the burden of proof on the issue of undue hardship. *Elmore v. Massachusetts Higher Education Assistance Corp. (In re Elmore)*, 230 B.R. 22, 25-26 (Bankr. D.Conn. 1999). The test requires a three-part showing that

> (1) the debtor could not maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans,
> (2) that additional circumstances existed indicating that this state of affairs was likely to persist for a significant portion of the repayment period of the student loans, and
> (3) that the debtor had made good faith efforts to repay the loans.
>
> *Brunner*, 831 F.2d at 396.

Further, "[i]f one of the requirements of the *Brunner* test is not met, the bankruptcy court's inquiry must end there, with a finding of no dischargeability." *Williams v. N.Y. State Higher Educ. Serv. Corp. (In re Williams)*, 296 B.R. 298, 302 (S.D.N.Y. 2003) (citing

---

[16] Section 1501(a) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") states, "[e]xcept as otherwise provided in this Act, this Act and the amendments made by this Act shall take effect 180 days after the date of enactment." 109 P.L. 8, 1501. BAPCPA was enacted on April 20, 2005. Therefore, BAPCPA took effect on October 17, 2005. Although Plaintiff's adversary proceeding was commenced after BAPCPA had taken effect, Plaintiff's petition for relief under Chapter 7 was filed on April 3, 2002, well before BAPCPA had taken effect. Therefore, BAPCPA does not apply. However, the Court notes that BAPCPA did not change or alter the standard to determine discharge of student loans based upon "undue hardship."

*Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir.

1995)), *aff'd*, 84 Fed. Appx. 158 (2d Cir. 2004).

## **FIRST PRONG**

  To satisfy the first prong of the test, the Plaintiff must provide "more than a showing of

tight finances." *In re Faish*, 72 F.3d at 306. Plaintiff here contends that her minimal income,

evidenced by her lack of employment, inability to gain employment due to her age and lack of

experience, and her status as a recipient of public assistance, does not allow her the further

expense of paying the Loans. She states that she is struggling to pay her current expenses,

including her rent, and that her utilities and "basic necessities" are past due. As previously

discussed, *supra* page 9-10, Plaintiff would have to reaffirm her loans and enter ICRP to make a

minimal payment. Further, because of Plaintiff's minimal income, Defendant has argued that

Plaintiff's monthly payment under her current situation would be $0.

  The Court here finds that Plaintiff has satisfied the first prong. Based on her current

income level and receipt of social services, the Court is satisfied that any payment which

Plaintiff would be required to make would not allow her to maintain the minimal standard of

living required by the test. Defendant's contention that Plaintiff would only have to make a $0

payment under the ICRP is not relevant under this prong. Plaintiff has not entered into the ICRP

and thus the $0 repayment obligation does not apply to her "current income and expenses,"

which are the proper factors considered under the first prong. Defendant has introduced the $0

repayment obligation as a factor to consider when weighing Plaintiff's expenses, arguing that $0

repayment would not be a burden to Plaintiff. However, because the $0 repayment obligation is

not, albeit by her own choice, part of her current income and expenses, it cannot be considered

under the first prong. The Court notes that had the Plaintiff entered into the ICRP, she may not

have been able to satisfy this prong.  However, by not entering into the ICRP, she has harmed her efforts to establish good faith, discussed *infra*.

## SECOND PRONG

The second prong requires that Plaintiff establish that "additional circumstances" exist which indicate that Plaintiff's "inability to find any work would extend for a significant portion of the loan repayment period." *Brunner*, 46 B.R. at 758.  In *Brunner* and related cases, only the fact that the debtor was disabled, elderly, had dependents or had evidence that indicated a total foreclosure of job prospects in her area of training, would be sufficient to meet the burden of this prong.

Plaintiff is not disabled or injured such that her employment potential would be impacted. She is 56 years old.  She has no children but her husband who is ill depends upon her.  However, Debtor argues that she will not be able to get employment given her past efforts and lack of success and argues that her age and lack of experience and current employment have and will continue to prevent her from obtaining employment.  She does not argue that her husband's health condition prevents her from obtaining employment.  However, she does argue that if she did obtain employment, she would have to secure care for him while she was at work.

Defendant argues that the second prong is a high standard to meet, where Plaintiff must show "a total incapacity…in the future to pay [her] debts for reasons not within [her] control." *In re Brightful*, 267 F.3d 324, 328 (3d. Cir. 2001).  Defendant argues that Plaintiff's degree and additional training, along with her lack of a physical or mental disability, qualify her to have some future prospect of employment.  Further, Defendant argues that Plaintiff may not select to only work in her field of training, but instead must accept a lower-paying job before claiming undue hardship.  *In re Gerhardt*, 348 F.3d 89, 93 (5th Cir. 2003).

The Court finds that the Plaintiff has failed to establish that additional circumstances exist to suggest that her inability to find any gainful employment would extend into the future. She has not provided any evidence that her health or age would interfere with her ability to gain employment. Although Plaintiff assists in the care of her husband, she has worked at certain jobs in the recent past, after the point at which her husband needed care, and has continued to search for employment that would require her to be absent from her home. Plaintiff has not provided evidence to establish that her responsibility of taking care of him will render her unable to work under any circumstance or present an insurmountable obstacle for her to seek employment. Further, she states that her working would result in her having to obtain a care provider for her husband. However, this issue is raised not as a restriction on her ability to find employment but as an economic consequence of her obtaining employment that would reduce any amount of future earnings. Therefore, Plaintiff has failed to satisfy the second prong of the *Brunner* standard.

## THIRD PRONG

The third prong under the *Brunner* test requires Plaintiff to establish that she has made good faith efforts to repay the student loans. However, "[a] finding of good faith . . . turns on several considerations including the debtor's efforts to obtain employment, maximize his income, minimize his expenses, and participate in alternative repayment options." *Foust v. Educ. Res. Inst., Inc. (In re Foust)*, 2006 Bankr. LEXIS 410 (Bankr. Fed. App. 2006) (citing *In re Hertzel*, 329 B.R. at 233-34 (quoting *Norasteh v. Boston Univ. (In re Norasteh)*, 311 B.R. 671, 676 (Bankr. S.D.N.Y. 2004))).

First, it is not disputed that Plaintiff twice attempted to pay back her loans starting first in 1979 and then again in 1985. Plaintiff contended that these payments should establish her good

faith efforts.  However, the Plaintiff has not demonstrated, or even asserted, any effort to repay

her loans since 1985.  Further, Plaintiff's claims that she and her husband have faced economic

hard times since September 11, 2001 may well explain her current economic status; however, she

does not explain adequately why she did not make any voluntary payments between 1985 and

2001.  Plaintiff's rationale is that she did not make a profit from her baking business during those

years.  However, Plaintiff noted that she filed income taxes jointly with her husband and that his

income was the main source of income.  Plaintiff has not explained why she did not use

household income to pay her debts.  Further, even if the household income was not sufficient or

if no funds were otherwise available to the Plaintiff to pay her debts, Plaintiff still does not

explain why she did not make an effort to seek other employment since her baking business was

providing her no income for an extensive period of time.

   As to Plaintiff's efforts to obtain employment, the Court finds Plaintiff's situation

comparable to the debtor's in *In re French*.  *French v. NCO Fin. Sys.* (*In re* French) 2006 Bankr.

LEXIS 2221 (Bankr. S.D.N.Y. 2006).  In that case, the court noted that the debtor had previously

held a variety of jobs and while she had provided the court with evidence of her unsuccessful job

search in her area, the court held that it was not extensive even within the industry.  *Id*. at 2222

(citing *Archibald v. United Student Aid Funds (In re Archibald)*, 280 B.R. 222, 227 (Bankr. S.D.

Ind. 2002) and *Dolph v. Pennsylvania Higher Educ. (In re Dolph)*, 215 B.R. 832 (Bankr. Fed.

App. 1998)).  The court, taking into consideration her varied prior positions, held that debtor's

"failure to meaningfully broaden her job search beyond the restaurant industry is inconsistent

with a finding of good faith."  *Id*. (citing *In re Kraft*, 161 B.R. 82 (Bankr. W.D.N.Y. 1993)).

   Here, although Plaintiff has provided the Court with some evidence that she has sought

employment, the Court is not convinced her search was broad or diligent enough.  When she first

graduated, Plaintiff focused her job search only on accounting positions.  After three years, she

seemingly gave up her job search to begin her baking business.  While she maintained her baking

business, she did not perform any job searches.  Plaintiff instead continued her baking business,

which did not produce any net income for sixteen years, without ever trying to supplement her

income or give up her business and pursue full-time employment elsewhere.

Once she closed her baking business, Plaintiff began her job search again by seeking

accounting and administrative positions; however, her search was again not sufficiently broad or

diligent.  Plaintiff did not broaden her search to include all of her past positions or abilities.

Even though Plaintiff was self-employed as a baker for sixteen years prior, she does not note any

applications to bakeries or other establishments that could utilize her baking skills.  Also,

Plaintiff herself notes that she has the skills to sew her own clothing; yet, she does not provide

evidence or maintain that she applied for positions as a seamstress.  Further, the positions to

which Plaintiff did apply outside of accounting, her field of training, were almost all

administrative or secretarial in nature.

As to Plaintiff's showing that she maximized income and minimized expenses, the Court

finds that Plaintiff has not met the burden of proof.  She provides no records that she minimized

her expenses for the approximate twenty-year period prior to her receiving public assistance and

the incurring of the Loans.  Further, as stated above, from 1985 until 2001, per her testimony,

Plaintiff continued to engage in her baking business, despite the fact that the business' expenses

were only equal to its income.

Finally, Defendant argues that Plaintiff has failed the good faith effort requirement

because she has failed to avail herself of alternative repayment options.  Defendant argues that

Plaintiff has repayment options under the Ford Program, such as the ICRP, which would provide

her with an affordable repayment plan, explaining that her monthly repayment amount due would be $0 under her current conditions. Defendant cited cases where the debtors' failures to avail themselves of alternative repayment options wholly or in part led to the respective court's finding that the debtor lacked good faith. See *Douglass v. Great Lakes Higher Educ. Servicing Corp.*, 237 B.R. 652, 658 (Bankr. N.D. Ohio 1999); *Standfuss v. United States Dep't of Educ.*, 245 B.R. 356 (Bankr. E.D. Mo. 2000); *United States Dep't of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 185 (D. Cal. 2000); *Thoms v. Educ. Credit Mgmt. Corp. (In re Thoms)*, 257 B.R. 144 (Bankr. S.D.N.Y. 2001); *Ritchie v. Northwest Educ. Loan Assn.*, 254 B.R. 913 (Bankr. Idaho 2000); *Naranjo v. Penn. Higher Educ. Assistance Agency*, 2000 WL 33155269, at 9 (Bankr. C.D. Cal. Dec. 8, 2000).

Although all of the preceding cases vary to a certain degree in fact patterns from the instant case, they generally support Defendant's argument that Plaintiff should have availed herself of the ICRP to demonstrate her "good faith" efforts. In *Douglass*, the debtor filed for relief before her loans even became due. In *Standfuss*, the debtor's obligation to pay the loans was the result of a consolidation loan agreement that was entered into after a default. In *Wallace*, the court did not directly make a holding in reference to good faith but rather cited some cases that "concluded that a debtor's effort—or lack thereof—to negotiate a repayment plan is an <u>important indicator</u> of good faith." *Wallace*, 259 B.R. at 185 (emphasis added).

However, this Court finds most persuasive the holding of *In re French* because of the closer similarity in facts. In the case of *In re French*, the court held, "[a] debtor's failure to avail herself of alternative repayment plans is not per se evidence of a lack of good faith, *Ford v. Student Loan Guarantee Foundation of Arkansas (In re Ford)*, 269 B.R. 673, 677 (8th Cir. B.A.P. 2001), but it can be a significant factor pointing towards such a conclusion. *In re French*

at 2221-22 (citing *In re Pincus*, 280 B.R. at 316; *In re Thoms*, 257 B.R. 144, 149 (Bankr. S.D.N.Y. 2001)).  As in *In re French*, Plaintiff here claimed that she rejected debt reorganization via an alternative repayment plan because she felt that she could not make any payment under any repayment plan.  However, also as in the cited case, the Plaintiff here has not apparently "made any attempt to explore reduced repayment options based on her financial circumstances," which the court said "would serve as evidence of a good faith effort to determine whether or not debt reorganization was a viable alternative to default." *Id*. at 2221.

Defendant did not offer Plaintiff an alternative repayment option until Plaintiff filed her adversary proceeding.  However, a debtor bears the burdens of making a good faith effort to repay her debt and inquiring what options are available to her to do so.  Over more than a twenty-year period of non-payment, the Debtor made no such inquiry.

Further, Plaintiff, who did not make payments for a period of twenty years, has failed to establish her inability to do so.  While a substantial amount of payments was made as a result of the application of various tax refunds to her debt, such payments were not voluntary.  Therefore, such payments are not evidence of Plaintiff's good faith.

In summary, Plaintiff did not sufficiently widen her search for employment, failed to maximize her income and minimize her expenses by engaging in a business that did not profit and did not inquire as to options for repayment.  Based upon the aforementioned, the Court finds that Plaintiff has failed to meet her burden to establish good faith.  Therefore, she has failed to satisfy the third prong.

## **CONCLUSION**

Based upon the foregoing analysis, Plaintiff has failed to establish "undue hardship" under 11 U.S.C. § 523(a)(8).  Therefore, Plaintiff's request to determine her student loan debt

dischargeable is denied.  Counsel for the Defendant is to settle an order consistent with this

opinion, reflecting the calculation of the remaining balance due on the loans and giving Plaintiff

credit for all payments she alleges to have made.


Dated: New York, New York
        December 15, 2006


                                        **s/Arthur J. Gonzalez**
                                        UNITED STATES BANKRUPTCY JUDGE